INTERPRETER

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CRIMINAL DOCKET FOR CASE #: <u>4:23–mj–02049</u>–1
### *Internal Use Only*

Case title: USA v. Canales–Rivera                     Date Filed: 11/13/2023

Other court case number:  2:20–cr–00577 Eastern District of
                                            New York, Central Islip

---

Assigned to: Magistrate Judge
Yvonne Y Ho

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Elmer Canales–Rivera** | represented by | **Alejandro Macias** |
| | | Law Office of Alejandro Macias, PC |
| | | 5300 Memorial Dr. |
| | | Suite 1000 |
| | | Houston, TX 77007 |
| | | 281–742–9508 |
| | | Fax: 281–823–8026 |
| | | Email: am@alejandromacias.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | |
| | | **Houston Interpreter** |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

**<u>Pending Counts</u>**                              **<u>Disposition</u>**

None

**<u>Highest Offense Level (Opening)</u>**

None

**<u>Terminated Counts</u>**                           **<u>Disposition</u>**

None

**<u>Highest Offense Level
(Terminated)</u>**

None

1

| **Complaints** | **Disposition** |
|---|---|
| Count 1 18 U.S.C. 2339A(a) and 3551 et seq. Conspiracy to Provide and Conceal Material Support and Resources to Terrorists; Criminal Forfeiture Allegation 18 U.S.C. 981(a)(1)(C) and 981(a)(1)(G); 21 U.S.C. 853(p); 28 U.S.C. 2461(c), Count 2 18 U.S.C. 2332b(a)(1)(A), 2332b(a)(2), 2332b(b)(1)(A), 2332b(b)(1)(B), 2332b(c) and 3551 et seq. Conspiracy to Commit Acts of Terrorism Transcending National Boundaries; Criminal Forfeiture Allegation 18 U.S.C. 981(a)(1)(C) and 981(a)(1)(G); 21 U.S.C. 853(p); 28 U.S.C. 2461(c), Count 3 18 U.S.C. 2339C(a)(1)(B), 2339C(a)(2) and 3551 et seq. Conspiracy to Finance Terrorism; ; Criminal Forfeiture Allegation 18 U.S.C. 981(a)(1)(C) and 981(a)(1)(G); 21 U.S.C. 853(p); 28 U.S.C. 2461(c), Count 4 21 U.S.C. 960a(a) 18 U.S.C.3551 et seq. Narco−Terrorism Conspiracy; Criminal Forfeiture Allegation 18 U.S.C. 981(a)(1)(G); 21 U.S.C. 853(a), 853(p) and 970; 28 U.S.C. 2461(c) | |

**Plaintiff**

**USA**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/15/2023 | 7 | COMMITMENT TO ANOTHER DISTRICT as to Elmer Canales−Rivera. Defendant committed to the Eastern District of New York. (Signed by Magistrate Judge Yvonne Y Ho) Parties notified. (RachelWillborg, 4) (Entered: 11/15/2023) |
| 11/15/2023 | 6 | BRADY ORDER on Rule 5(f) as to Elmer Canales−Rivera (Signed by Magistrate Judge Yvonne Y Ho) Parties notified. (RachelWillborg, 4) (Entered: 11/15/2023) |
| 11/15/2023 | | Minute Entry for proceedings held before Magistrate Judge Yvonne Y Ho: IDENTITY AND DETENTION HEARING as to Elmer Canales−Rivera held on 11/15/2023. Defendant appeared with counsel. Brady Order administered. Defendant WAIVED Identity hearing on the record. Defendant WAIVED detention hearing on the record in the Southern District of Texas, but reserves the right to hold the hearing in the Eastern |

| | | |
|---|---|---|
| | | District of New York, Central Islip Division. Commitment Order to be entered. Appearances: AUSA: John Michael Lewis; Alejandro Macias for deft. (ERO: Yes) (Interpreter: Yes) Deft remanded to Custody of U.S. Marshal, filed. (RachelWillborg, 4) (Entered: 11/15/2023) |
| 11/15/2023 | 5 | Pretrial Services Report (Sealed) as to Elmer Canales–Rivera, filed. (RochelleHorton, 4) (Entered: 11/15/2023) |
| 11/14/2023 | 4 | ORDER APPOINTING COUNSEL FOR LIMITED PURPOSE for Defendant Elmer Canales–Rivera. Alejandro Macias appointed. (Signed by Magistrate Judge Yvonne Y Ho) Parties notified. (RachelWillborg, 4) (Entered: 11/14/2023) |
| 11/13/2023 | | Interpreter needed as to Elmer Canales–Rivera. Language: SPANISH. Houston Interpreter for Elmer Canales–Rivera added. (RachelWillborg, 4) (Entered: 11/13/2023) |
| 11/13/2023 | 3 | Order of Temporary Detention Pending Hearing as to Elmer Canales–Rivera Identity and Detention Hearing set for 11/15/2023 at 11:00 AM in Courtroom 704 before Magistrate Judge Yvonne Y Ho ( Signed by Magistrate Judge Yvonne Y Ho) Parties notified. (RachelWillborg, 4) (Entered: 11/13/2023) |
| 11/13/2023 | | INITIAL APPEARANCE IN RULE 5(c)(3) Minute Entry for proceedings held on 11/13/2023 before Magistrate Judge Yvonne Y Ho as to Elmer Canales–Rivera. Defendant first appearance on Indictment from the New York Eastern District Court CR–20–577 and advised of rights/charges. Defendant appeared without counsel, Defendant requests appointed counsel, Financial Affidavit executed on the record. Hearing to be set, Order of Temporary Detention to be entered. Identity and Detention Hearing set for 11/15/2023 at 11:00 AM in Courtroom 704 before Magistrate Judge Yvonne Y Ho Court to appoint counsel from CJA Panel. Appearances: AUSA John Ganz for USA.(ERO:Yes) (Interpreter: Yes) Defendant remanded to custody, filed. (RachelWillborg, 4) (Entered: 11/13/2023) |
| 11/13/2023 | | Arrest of Elmer Canales–Rivera, filed. (RachelWillborg, 4) (Entered: 11/13/2023) |
| 11/13/2023 | | ***Set/Reset Hearings as to Elmer Canales–Rivera: Initial Appearance – Rule 40 set for 11/13/2023 at 02:00 PM in Courtroom 704 before Magistrate Judge Yvonne Y Ho (GeorgeKelner, 4) (Entered: 11/13/2023) |
| 11/13/2023 | 2 | Arrest Warrant issued 12/16/2020; Returned Executed on 11/9/2023 as to Elmer Canales–Rivera. Defendant was arrested in Houston, TX. Document restricted from PACER under privacy policy., filed. (GeorgeKelner, 4) (Entered: 11/13/2023) |
| 11/13/2023 | | Arrest (Rule 40) of Elmer Canales–Rivera, filed. (GeorgeKelner, 4) (Entered: 11/13/2023) |
| 11/13/2023 | 1 | Indictment from Eastern District of New York, Central Islip Division as to Elmer Canales–Rivera, filed.(GeorgeKelner, 4) (Entered: 11/13/2023) |

United States District Court
Southern District of Texas
**ENTERED**
November 15, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 4:23–mj–02049 |
| | § | |
| Elmer Canales–Rivera | § | |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the **Eastern District of New York, Central Islip Division division, in CR–20–577.**

**The defendant may need an interpreter for this language: Spanish**.

The defendant requested court appointed counsel. CJA Attorney appointed.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date: November 15, 2023

Yvonne Y. Ho
United States Magistrate Judge

Reserves right to hold detention hearing in New York

4

United States District Court
Southern District of Texas
**ENTERED**
November 15, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 4:23−mj−02049 |
| | § | |
| Elmer Canales−Rivera | § | |

### ORDER

In accordance with Federal Rule of Criminal Procedure 5(f), as amended by the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (Oct. 21, 2020), the Government is **ORDERED** to comply with the prosecutor's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The Government is also notified of the potential consequences of violating this Order and the disclosure obligations. The consequences include, but are not limited to, sanctions such as delaying trial or other proceedings, excluding evidence, giving adverse jury instructions, granting a new trial, dismissing the case, or finding the Government in contempt.

It is so **ORDERED**.

**SIGNED** on November 15, 2023.

Yvonne Y. Ho
United States Magistrate Judge

Canales-Rivera, Elmer

# <u>CONFIDENTIALITY OF PRETRIAL SERVICES</u>

# <u>REPORTS AND INFORMATION</u>

Title 18, United States Code, Section 3153(c)(1) restricts the uses of information and reports on Pretrial Services. **Information and reports are to be used only for the purposes of a bail determination and shall otherwise be confidential.**

Pretrial Services bail reports and detention reports are not to be made accessible to the public, to agents, to the media or to others, and are furnished to counsel for the defendant and the government exclusively for the bail hearing. **If for any reason the report[s] is ordered placed in evidence, it should be under seal.**

As mandated by Section 3153(c)(2), the Director of the Administrative Office of the U.S. Courts has issued **Confidentiality Regulations** (see Guide to Judiciary Policies and Procedures, Pretrial Services Manual, June 10, 1985). The introduction to the Regulations and the Regulations themselves caution that even where written findings are required in detention orders (see Section 3142i), the Pretrial Services report--from which the Court's findings may be drawn--is not to be made part of the public record. Similarly, the Pretrial Services Officer is not to be routinely called upon to testify for the Government or for the defense.

**(Copies of the Confidentiality Regulations have been provided to the Court and will be made available to counsel upon request.)**

Canales-Rivera, Elmer

PS3

# PRETRIAL REPORT

*According to Judiciary Policy, several factors fall solely within the province of the judicial officer and are not to be considered by the officer. These factors include: the weight of the evidence, the rebuttable presumption, and potential penalty.*

| District/Office **SOUTHERN DISTRICT OF TEXAS**-Houston | Charge(s) (Title, Section, and Description) |
|---|---|
| Judicial Officer United States Magistrate Judge Yvonne Y. Ho | 18 U.S.C. § 2339A(a) Conspiracy to Provide and Conceal Material Support and Resources to Terrorists |
| Docket Number (Year-Sequence No.-Deft. No.) 4:23MJ-02049-001 **Rule 5** - Eastern District Of New York 2:20-cr-00577-JMA-2 | 18 U.S.C. § 2332b(a)(1)(A), 18 U.S.C. § 2332b(a)(2), 18 U.S.C. § 2332b(b)(1)(A), 18 U.S.C. § 2332b(b)(1)(8), 18 U.S.C. § 2332b(c) Conspiracy to Commit Acts of Terrorism Transcending National Boundaries 18 U.S.C. § 2339C(a)(1)(8), 18 U.S.C. § 2339C(a)(2) Conspiracy to Finance Terrorism 21 U.S.C. § 960a(a) Narco-Terrorism Conspiracy |

## DEFENDANT

| Name | Canales-Rivera, Elmer | Employer Unemployed | | |
|---|---|---|---|---|
| Address: | Buenos Aires, San Marcos San Salvador , El Salvador | Employer Address N/A | | |
| Time at Address 1/21/1976 | Time in Community Life | Monthly Income $0 | Time Unemployed 4 days |

On November 13, 2023, the defendant is set to appear before the U.S. Magistrate Judge Yvonne Y. Ho for an initial appearance. The defendant was interviewed virtually on November 13, 2023, at the U.S. Marshals without the presence of defense attorney.

## DEFENDANT HISTORY

1. **DEFENDANT HISTORY/RESIDENCE/FAMILY TIES:**

Elmer Canales-Rivera, age 47, advised he is a citizen of El Salvador, and was born and raised in La Unión Department, El Salvador. The defendant reported his father passed away in 2020 and he believes his mother has passed away however cannot confirm she passed as he has not maintained communication with his mother. The

Canales-Rivera, Elmer

defendant stated he had 2 siblings however the defendant stated his siblings were killed in El Salvador. The defendant advised he first entered the United States in 1999 and resided in Los Angeles, California for one month. The defendant stated he visited his mother who resided in Maryland for 6 months at which point he returned to El Salvador. The defendant advised he does not reside in the United States and does not have any legal standing in the United States.**. Per I.C.E. the defendant is not legally in the United States and appears to be subject to removal proceedings. The United States Marshals advised there is not an active immigration detainer in place at this time.** The defendant sated upon his return to El Salvador he was incarcerated and was released in November 2021 where he resided with his partner at the above noted address. The defendant stated he is the owner of the home in El Salvador and denies owning a firearm or a presence of firearms in the home. **The defendant advised should he be released on bond he would return to his home in El Salvador.**

The defendant advised he and his partner have been together for 15 years and share 2 children, 1 son (age 15) and 1 child who passed away. The defendant stated he fathered 4 children, 1 son (ages 27), 3 daughters (ages 25, 24, and 18) from a previous relationship. The defendant stated 3 of his children reside in the United States, in Seattle, California, and New Jersey. The defendant stated his children are citizens of El Salvador and does not any communication with his children.

The defendant advised he last attended the 8th grade in a secondary school in El Salvador. The defendant stated he is not currently in any educational program and denies any military history.

The defendant advised he does not possess a Passport from the Republic of El Salvador. The defendant denies any international travel aside from being extradited to the United States for the current federal offense.

**The defendant was unable to provide any names or contact information for a collateral source. With the exception of any criminal record, the following information in this report has not been corroborated or verified and is based solely on information provided by the defendant.**

2. **EMPLOYMENT HISTORY / FINANCIAL RESOURCES:**

   **Employed/Unemployed History:**

   | Start Date | End Date | Employer Name/ Unemployed | Address | Monthly Income | Time in Status/ Hours a Week |
   |---|---|---|---|---|---|
   | 11/09/2023 | | Unemployed - | | $0.00 | 4 days/ Not applicable |
   | 11/01/2021 | 11/09/2023 | Mechanic/Welder | Mexico | $6,000 Pesos | 3 years |

   The defendant provided the above listed employment information. The defendant stated prior to extradition he worked as a mechanic and welder with a friend who is an independent contractor. The defendant advised he has maintained a career as a mechanic and welder throughout his life and stated he would be able to locate employment within this field should he be released on bond.

   **This information has not been corroborated or verified by a collateral source.**

   **Finances:**

Canales-Rivera, Elmer

| Assets | Amount | Liabilities | Amount |
|--------|--------|-------------|--------|
| | | | |
| **Total** | $0 | **Total** | $0 |
| **Estimated Net Worth: $0** | | | |

| Monthly Income | Amount | Expenses | Amount |
|----------------|--------|----------|--------|
| | | Home/Rent | $200.00 |
| | | Groceries and Supplies | $175.00 |
| | | Utilities | $125.00 |
| | | | |
| **Total** | $0 | **Total** | $500 |
| **Estimated Monthly Cash Flow: ($500)** | | | |

The defendant provided the above listed financial information. It should be noted the above listed amounts have been converted to U.S. Dollars. The defendant stated he covered all household expenses and necessities.

**This information has not been corroborated or verified by a collateral source.**

3. **HEALTH:**

**Physical Health:**
The defendant stated he is in good physical health with no medical problems reported.

**Mental Health:**
There is no evidence to suggest the defendant has a current or past mental health condition.

**Substance Abuse:**
The defendant reported the following substance abuse, beginning at age 14:

| Drug Name | Frequency Used | Last Used |
|-----------|----------------|-----------|
| Cannabinoids | occasional | 33 years ago |

**Treatment History**
The defendant did not report any history of substance abuse treatment.

**This information has not been corroborated or verified by a collateral source.**

4. **PRIOR RECORD:**

The defendant reported no criminal history. A criminal record check conducted through the National Crime Information Center (NCIC), state, and local records revealed no criminal history for the defendant.

Canales-Rivera, Elmer

## 5. ASSESSMENT OF NONAPPEARANCE:

The defendant poses a risk of nonappearance for the following reasons:
1. Offense Charged and/or Defendant's Conduct During Arrest for Instant Offense
2. Lack of Familial, Residential, Community, Employment, Property, and Financial Ties
3. Lack of Verifiable, Legitimate Employment
4. Ties to a Foreign Country
5. Unverified Information

## 6. ASSESSMENT OF DANGER:

The defendant poses a risk of danger for the following reasons:
1. Nature of Instant Offense

## 7. RECOMMENDATION

***According to Judiciary Policy, several factors fall solely within the province of the judicial officer and are not to be considered by the officer. These factors include: the weight of the evidence, the rebuttable presumption, and potential penalty.***

The United States Probation Office respectfully recommends that the defendant be held in detention since there is no condition or combination of conditions that can reasonably assure the defendant's appearance before this Court and/or the safety of the community.

| United States Probation Officer<br>Sergio SALINAS    *Sergio Salinas*    832-570-4464 | Date/Time<br>November 13, 2023 @ 12:00pm |
|---|---|
| Supervising United States Probation Officer<br>Elizabeth MARTINEZ  *Elizabeth Martinez* | Date/Time<br>11-13-23 |

4

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States District Court
Southern District of Texas

**ENTERED**

November 14, 2023

Nathan Ochsner, Clerk

UNITED STATES OF AMERICA §
§
*versus* §  Case No. 4:23–mj–02049
§
Elmer Canales–Rivera §

## <u>ORDER APPOINTING COUNSEL FOR LIMITED PURPOSE</u>

Because the Defendant, Elmer Canales–Rivera, has satisfied this court that (s)he is financially unable to employ counsel for initial appearance only and does not wish to waive counsel, and because the interests of justice so require, an attorney is hereby **APPOINTED** to represent Defendant in the above designated case for the **limited purpose of any hearing conducted in Houston, Texas**, and shall have no effect once the Defendant is transferred to the original court in the Northern District of New York, Central Islip Division. Once transferred, the original court must make a new determination on whether the Defendant satisfies the requirements for appointed counsel based on the information available to the court at that time.

### Attorney appointed: Alejandro Macias

The appointment **SHALL** remain in effect until Defendant is transferred to the original jurisdiction and this case is terminated in the Southern District of Texas.

Signed on November 14, 2023.

_____
Yvonne Y. Ho
United States Magistrate Judge

11

United States District Court
Southern District of Texas
**ENTERED**
November 13, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | Case No. 4:23–mj–02049 |
| | § | |
| Elmer Canales–Rivera | § | |

## ORDER TO DETAIN A DEFENDANT TEMPORARILY UNDER 18 U.S.C. § 3142(d)

At the time of the alleged offense, the defendant was not a United States citizen or a person lawfully admitted for permanent residence, or, alternatively, the defendant was on release pending trial for a state or federal felony; on release after conviction for any type of offense, state or federal; or on probation or parole. This court finds that the defendant, if released, may flee or pose a danger to another person or the community.

**IT IS ORDERED:** The defendant must be detained temporarily under 18 U.S.C. § 3142(d) until the hearing in this case scheduled as follows: **Identity and Detention Hearing set for November 15, 2023 at 11:00 AM before Yvonne Y Ho.**

The attorney for the government is directed to notify the appropriate court, probation or parole officer, state or local law enforcement officer, or the United States Citizenship and Immigration Services so that a detainer may be placed on the defendant or custody may be transferred. If no action is taken by the above date, the defendant must be brought before this court on that date for further proceedings.

Date: November 13, 2023

Yvonne Y. Ho
United States Magistrate Judge

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| ELMER CANALES-RIVERA, | ) | **CR 20 577** |
| also known as "Crook de Hollywood," | ) | |
| *Defendant* | ) | **BROWN, J.** |

TISCIONE, M.J.

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     ELMER CANALES-RIVERA, also known as "Crook de Hollywood"

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Provide and Conceal Material Support and Resources to Terrorists in violation of Title 18, United States Code, Section 2339A(a); Conspiracy to Commit Acts of Terrorism Transcending National Boundaries in violation of Title 18, United States Code, Sections 2332b(a)(1)(A), 2332b(a)(2), 2332b(b)(1)(A), 2332b(b)(1)(B) and 2332b(c); Conspiracy to Finance Terrorism in violation of Title 18, United States Code, Sections 2339C(a)(1)(B) and 2339C(a)(2); Narco-Terrorism Conspiracy in violation of Title 21, United States Code, Section 960a(a).

Date:     12/16/2020

*Steven Tiscione*
*Issuing officer's signature*

City and state:     Central Islip, NY

The Honorable Steven L. Tiscione
*Printed name and title*

| Return     cell block executed |
|---|

This warrant was received on *(date)* 12/16/2020 , and the person was arrested on *(date)* 11/09/2023
at *(city and state)* Houston. TX

Date: 11/09/2023

*Adrian Macias*
*Arresting officer's signature*

A. Macias     DCO
*Printed name and title*

13

United States Courts
Southern District of Texas
FILED

*November 13, 2023*

JJD:JD/MWS/SMY  Nathan Ochsner, Clerk of Court
F. #2020R00632

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 1 0 2020 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

BORROMEO ENRIQUE HENRIQUEZ,
     also known as "Diablito de Hollywood,"
ELMER CANALES-RIVERA,
     also known as "Crook de Hollywood,"
EFRAIN CORTEZ,
     also known as "Tigre de Park View" and
     "Viejo Tigre de Park View,"
RICARDO ALBERTO DIAZ,
     also known as "Rata de Leewards"
     and "Mousey de Leewards,"
EDUARDO ERAZO-NOLASCO,
     also known as "Colocho de Western"
     and "Mustage de Western,"
EDSON SACHARY EUFEMIA,
     also known as "Speedy de Park View,"
JOSE FERNANDEZ FLORES-CUBAS,
     also known as "Cola de Western,"
FREDY IVAN JANDRES-PARADA,
     also known as "Lucky de Park View"
     and "Lacky de Park View,"
LEONEL ALEXANDER LEONARDO,
     also known as "El Necio de San Cocos,"
CESAR HUMBERTO LOPEZ-LARIOS,
     also known as "El Grenas de Stoners"
     and "Oso de Stoners,"
JOSE LUIS MENDOZA-FIGUEROA,
     also known as "Pavas de 7-11" and
     "Viejo Pavas de 7-11,"
HUGO ARMANDO QUINTEROS-MINEROS,
     also known as "Flaco de Francis,"

**4:23-mj-2049**

**I N D I C T M E N T**

**C R   2 0   5 7 7**

Cr. No. _____

(T. 18, U.S.C., §§ 981(a)(1)(C),
981(a)(1)(G), 2332b(a)(1)(A), 2332b(a)(2),
2332b(b)(1)(A), 2332b(b)(1)(B), 2332b(c),
2339A(a), 2339C(a)(1)(B), 2339C(a)(2) and
3551 et seq.; T. 21, U.S.C., §§ 853(a),
853(p), 960a(a), and 970); T. 28, U.S.C.,
§ 2461(c))

**BROWN, J.**

**TISCIONE, M.J.**

14

SAUL ANTONIO TURCIOS,
          also known as "Trece de Teclas," and
ARISTIDES DIONISIO UMANZOR,
          also known as "Sirra de Teclas,"

                  Defendants.

– – – – – – – – – – – – – – – – – – X

THE GRAND JURY CHARGES:

## INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

      1.      La Mara Salvatrucha (hereinafter "MS-13") was a transnational criminal organization with tens of thousands of members worldwide whose members engaged in "terrorist activity," as defined by Title 8, United States Code, Section 1182(a)(3)(B)(iii) and (iv), and in "terrorism," as defined by Title 22, United States Code, Section 2656f(d)(2). MS-13 and its members used violence against law enforcement, military members, government officials and civilians in El Salvador in order to obtain concessions from the government of El Salvador, achieve political goals and retaliate for government actions against MS-13's members and leaders. MS-13's leaders also directed members to commit acts of violence, including murder, in the United States. In order to achieve its goals in El Salvador, the United States and elsewhere, MS-13's leaders recruited large numbers of members; established an organizational leadership structure; issued rules to govern MS-13's members; established military-style training camps; obtained weapons such as rifles, handguns, grenades, improvised explosive devices ("IEDs") and rocket launchers; negotiated with El Salvador government officials; engaged in public relations efforts; controlled neighborhoods; and directed acts of violence and murder in El Salvador, the United States and elsewhere. Further, MS-13 used its large membership in the United States to

2

engage in criminal activities such as drug trafficking and extortion to raise money to support MS-13's terrorist activities and terrorism in El Salvador and elsewhere, and directed members in the United States to commit acts of violence, including murders, in furtherance of MS-13's goals and to retaliate against the United States for actions, or perceived actions, taken against MS-13 and its leaders.

## History of MS-13

2.    MS-13 was established in the 1980s in the United States by Central American immigrants in southern California. Many of these immigrants were refugees from civil wars in Central America. Immigrants from El Salvador, Honduras and Guatemala joined together into neighborhood groups calling themselves the "Mara Salvatrucha Stoners." The "Mara Salvatrucha Stoners" evolved into a street gang that engaged in drug trafficking, extortion and acts of violence, and dropped the reference to "Stoners" in their name. As members were arrested and incarcerated, they encountered members of the Mexican Mafia, which controlled large portions of the Hispanic prison population in California. In order to gain protection while in prison, Mara Salvatrucha members pledged loyalty to the prison gang, the Mexican Mafia, and added the number 13 to their name, which became "La Mara Salvatrucha 13," or "MS-13."

3.    MS-13 gang members in California organized themselves into local neighborhood groups known as "cliques." These cliques often were named after streets or neighborhoods in the Los Angeles area, such as Hollywood, Park View, Normandie, Francis, Fulton and Coronado. MS-13 also developed symbols and signs to signify gang membership and territory through use of tattoos, hand signs and graffiti. These symbols included the "devil's horns" and tattoos of the letters M and S and the number 13. MS-13 developed intense rivalries

3

with other street gangs with members who were Central American immigrants, particularly with "Barrio 18" or "18th Street" (hereinafter "18th Street").

4.    By the 1990s, the civil wars in El Salvador and elsewhere in Central America ended.  Ultimately, thousands of MS-13 members who had committed crimes in the United States were deported to El Salvador and other Central American countries.  These deported MS-13 members brought MS-13 to El Salvador, Honduras and Guatemala where it began to grow dramatically.  Eventually, MS-13 grew to include tens of thousands of members in El Salvador, Honduras, Guatemala, Mexico, the United States and elsewhere.  As MS-13 members immigrated throughout the United States, MS-13 grew to include thousands of members located in dozens of states, including New York, Massachusetts, Virginia, Maryland, North Carolina, Ohio, Tennessee, Texas, California and Nevada.

### Creation of the *Ranfla*

5.    As MS-13 grew in El Salvador, members of MS-13 began to commit crimes in El Salvador, including acts of violence, drug trafficking and extortion.  MS-13 members were incarcerated in prisons in El Salvador in large numbers and, in the early 2000s, began to organize and sought to control the prisons where they were incarcerated.  This organization included the creation of a formal hierarchy, set of rules and leadership body to control and profit from the activities of the gang in El Salvador, the United States and elsewhere. In approximately 2002, MS-13 members in a Salvadoran prison organized the first leadership body for MS-13, known as the "Twelve Apostles of the Devil," which included the defendants BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de Hollywood," ELMER CANALES-RIVERA, also known as "Crook de Hollywood," RICARDO ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," EDUARDO ERAZO-

4

NOLASCO, also known as "Colocho de Western" and "Mustage de Western," EDSON SACHARY EUFEMIA, also known as "Speedy de Park View," LEONEL ALEXANDER LEONARDO, also known as "El Necio de San Cocos," CESAR HUMBERTO LOPEZ-LARIOS, also known as "El Grenas de Stoners" and "Oso de Stoners," JOSE LUIS MENDOZA-FIGUEROA, also known as "Pavas de 7-11" and "Viejo Pavas de 7-11," HUGO ARMANDO QUINTEROS-MINEROS, also known as "Flaco de Francis," and SAUL ANTONIO TURCIOS, also known as "Trece de Teclas."

6.     In approximately 2004, the "Twelve Apostles of the Devil" were transferred to a new prison and renamed themselves as the "*Ranfla*." Members of the original *Ranfla* became known as the "*Ranfla Historica*." Subsequently, the original leaders of the *Ranfla Historica* and other high-ranking leaders such as the defendants EFRAIN CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," JOSE FERNANDEZ FLORES-CUBAS, also known as "Cola de Western," FREDY IVAN JANDRES-PARADA, also known as "Lucky de Park View" and "Lacky de Park View," and ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas," formed the "*Ranfla Nacional*," which was the highest level of leadership in MS-13 and provided overall direction for the gang, acting as the equivalent of a "board of directors." Each of the defendants was a member of the *Ranfla Nacional*.

<u>Organization of MS-13</u>

7.     The *Ranfla Nacional* organized MS-13 into a more formal hierarchy to manage gang activities in El Salvador, the United States and elsewhere. MS-13 was organized at its lowest level into groups known as "cliques" that held regular meetings to coordinate gang activities. Each clique was run by a senior leader, who was designated the "*Primera Palabra*,"

5

18

or "First Word," and, in some cases, a second-in-command, who was designated the "*Segunda Palabra*" or "Second Word." The other members of the clique took their orders from the First Word or Second Word. The leaders of the respective cliques attended larger general meetings to manage gang operations on a regional and international level. Some cliques had members in both the United States and El Salvador or other Central American countries.

8.      MS-13 members attended clique meetings and were required to pay dues. MS-13 members obtained money through illegal means, including, but not limited to, extortion and drug trafficking. The money was provided to clique leaders and used to finance clique activities, to provide support for clique members who were in jail, and, with respect to the United States-based cliques, to send funds to MS-13 in El Salvador to support gang activities there, including for the purchase of weapons.

9.      MS-13 cliques were organized together under umbrella groups, called "Programs." Cliques within a Program were responsible for assisting one another with obtaining firearms, sharing drug trafficking connections, responding to territorial disputes with rival gangs and providing safe havens for members who were wanted by law enforcement. Programs were supervised and directed by Program leaders based in El Salvador, commonly referred to as "*Corredors.*" These Program leaders controlled cliques located in the United States.

10.      Above the Program level, MS-13 in El Salvador was divided into "Zones." Numerous Programs fell under each zone. Individuals holding the title of "Zone *Corredor*" often supervised multiple Program *Corredors*. Zone *Corredors* supervised the Program activities occurring in large zones of El Salvador and were tasked with supervising multiple Programs.

6

11.     Above the Zone *Corredors* were higher levels of leadership. Immediately above the Zone *Corredors* were the "*Ranfla en las Calles*," or the "*Ranfla* in the Streets," which consisted of leadership that was not in prison. Some Zone *Corredors* were also considered to be "*Ranfla en las Calles*." The most powerful leaders in the "*Ranfla en las Calles*" formed a group to coordinate their activities that was called the *Federacion*. The "*Ranfla en las Calles*" reported to the "*Ranfla en los Penales*," or the "*Ranfla* in the Prisons," which consisted of senior MS-13 leaders who were incarcerated in El Salvador. The "*Ranfla en las Calles*" and the "*Ranfla en los Penales*" reported to the highest level of leadership, which was the *Ranfla Nacional*. All major decisions for MS-13 had to be approved by the *Ranfla Nacional*.

12.     By approximately 2015, MS-13 consisted of tens of thousands of members organized into more than 200 cliques and dozens of Programs in El Salvador, Honduras, Guatemala, Mexico, the United States and elsewhere. Since 2015, there have been additional reorganizations, which have changed the numbers of cliques and Programs.

MS-13 Rules

13.     In order to maintain control over the membership of MS-13, the *Ranfla Nacional* developed rules to govern the behavior of members. The *Ranfla Nacional* distributed these rules from prison to leaders in El Salvador, who then distributed the rules to members in El Salvador, the United States and elsewhere. Only the *Ranfla Nacional* could change the rules or add new rules. As circumstances changed, the *Ranfla Nacional* made changes to the rules. For example, after law enforcement in the United States began to use MS-13 tattoos as evidence against MS-13 members at trial, the *Ranfla Nacional* changed the rules to restrict members from getting MS-13 tattoos without the permission of MS-13 leaders.

7

14.    A central theme of the rules was the requirement of loyalty to MS-13, or to the "*barrio*."  The requirement for loyalty was central to all aspects of life for MS-13 members.  Members who disobeyed the rules, showed disloyalty to the gang or to its leaders, cooperated with law enforcement or disrespected other members were subject to severe punishment, including death.

<u>Means of Financing MS-13 Operations</u>

15.    MS-13 members in El Salvador, the United States, including in the Eastern District of New York, and elsewhere engaged in criminal activity to finance MS-13 operations.  Commonly, MS-13 engaged in extortion of individuals and businesses, both legitimate and illegitimate.  This extortion was known as paying "rent" to MS-13, and was a means of exercising control over neighborhoods and communities.

16.    MS-13 also engaged in drug trafficking to earn money to support its operations.  MS-13 members and cliques trafficked in marijuana, cocaine, heroin and methamphetamine in El Salvador, the United States, including in the Eastern District of New York, and elsewhere.  Proceeds from drug trafficking were collected by MS-13 leaders to support gang activities, including purchasing weapons in El Salvador and the United States.  Drug trafficking proceeds were also sent by wire transfer from members and cliques in the United States to MS-13 in El Salvador, often using non-gang members to send or receive the money to conceal the transfers from law enforcement.

<u>Control of MS-13 from Prison</u>

17.    As MS-13 grew in power in El Salvador, members of the *Ranfla Nacional* were incarcerated, but continued to manage the activities of MS-13 in El Salvador and the United States through the use of contraband cellular telephones, the smuggling of written messages

8

known as "*wilas*" out of prisons, intermediaries and the organizational structure of subordinate leaders. The *Ranfla Nacional* established the organizational structure, in part, to ensure its ability to maintain control of MS-13 when *Ranfla Nacional* members were incarcerated and subject to harsh security measures.

### The Role of the *Ranfla Nacional* in the United States and the Eastern District of New York

18.     The *Ranfla Nacional* exercised control over the activities of MS-13 in the United States, including in the Eastern District of New York. The actions of MS-13 cliques and members in the United States were regulated by the rules and organizational structure put in place by the *Ranfla Nacional*. The rules issued by the *Ranfla Nacional* controlled the process for recruitment of new members and advancement to higher ranks for members in the United States. The *Ranfla Nacional* required MS-13 members to obtain the approval of the *Ranfla Nacional* prior to immigrating to the United States. Certain murders in the United States by members of MS-13, including the murder of MS-13 members suspected of cooperating with law enforcement or otherwise violating the rules of MS-13, required the approval of the *Ranfla Nacional*. Cliques in the United States were also required to send money from dues and proceeds of drug trafficking, extortion and other criminal activity to MS-13 in El Salvador. In order to exert greater control over the operation of cliques in the United States, the *Ranfla Nacional* sent trusted, subordinate leaders to the United States to manage the activities of cliques and enforce MS-13 rules, which resulted in an increase of violence in the United States.

19.     MS-13 established multiple cliques in the Eastern District of New York. Members of these cliques operated under the rules and followed orders issued by the *Ranfla Nacional* in El Salvador. The *Ranfla Nacional* resolved disputes between cliques in the Eastern District of New York. In accordance with the rules and orders issued by the *Ranfla Nacional*,

members of these cliques committed multiple acts of violence in the Eastern District of New York, including murders, attempted murders, assaults and kidnappings; trafficked drugs in the Eastern District of New York and sent proceeds back to MS-13 in El Salvador; engaged in extortion of individuals and businesses in the Eastern District of New York; and sent dues and the proceeds of criminal activity by wire transfer from the Eastern District of New York to MS-13 in El Salvador.

### Expansion to Mexico

20.     The *Ranfla Nacional* directed the expansion of MS-13 activities into Mexico and sent several high-ranking leaders to Mexico to organize operations there. In Mexico, MS-13 leaders made connections to obtain narcotics and firearms, conducted business with Mexican drug cartels such as the Zetas, Gulf Cartel, Jalisco New Generation Cartel ("CJNG") and Sinaloa Cartel, and engaged in human trafficking and smuggling.

### "Green Lights" and "Opening the Valves"

21.     The *Ranfla Nacional* had the power to approve a "green light" on anyone it chose. A "green light" was an order to murder the subject of the "green light." The *Ranfla Nacional* approved "green lights" on rival gang members, law enforcement officers, military members, government officials, witnesses, MS-13 members who cooperated with law enforcement, MS-13 members who appeared to be challenging the leadership of the *Ranfla Nacional*, MS-13 members who disobeyed the rules and anyone it felt had disrespected them or MS-13. The *Ranfla Nacional* could order a "green light" on individuals or on a group. For example, in approximately 2004, the *Ranfla Nacional* ordered a "green light" on all members of the Coronados clique due to a dispute between the Coronados and other cliques. The "green light" applied to specific leaders and to all members of the clique who did not join other cliques.

10

22.     In addition to ordering a "green light" to kill a specific person, the *Ranfla Nacional* would also sometimes authorize MS-13 members to generally commit murders of rivals, law enforcement cooperators, police officers, witnesses, violators of MS-13 rules and anyone else believed to be worthy of death. The *Ranfla Nacional* called this "opening the valves." Only the *Ranfla Nacional* could order the "opening of the valves," to generally authorize members to commit murders. Orders to "open the valves" were also transmitted and applied to members in the United States. When the *Ranfla Nacional* determined that it was no longer in its interest to authorize murder generally, "the valves were closed" on the *Ranfla Nacional*'s order. The purposes of "opening the valves" were to cause fear and intimidation, to influence government conduct and to retaliate against government action.

### Political Influence in El Salvador

23.     The *Ranfla Nacional* gained political influence as a result of the violence and intimidation MS-13 exerted on the government and population of El Salvador. Through extortion and violence, MS-13 controlled large parts of El Salvador's economy, particularly the mass transportation industry. Through control of the level of violence, the *Ranfla Nacional* exercised leverage over the government of El Salvador. In approximately 2012, the *Ranfla Nacional* engaged in secret negotiations with members of the ruling Farabundo Marti National Liberation Front ("FMLN") party of El Salvador, and MS-13's principal rival, the 18th Street, to enter into a "truce" to reduce homicides in El Salvador in exchange for improved prison conditions, benefits and money. Ultimately, the leaders of the *Ranfla Nacional* agreed to reduce violence in exchange for prisoner transfers to a less secure prison, increased benefits such as conjugal visits and cash payments. The *Ranfla Nacional* also negotiated with the FMLN and its rival political party, the Alianza Republicana Nacionalista ("ARENA"), to provide votes to

11

political candidates in exchange for benefits for MS-13 and the members of the *Ranfla Nacional* themselves. From approximately 2012 until approximately 2015, the *Ranfla Nacional* directed that MS-13 should reduce homicides in El Salvador. In exchange, the *Ranfla Nacional* received improved prison conditions, benefits for MS-13 and cash payments. However, in approximately 2015 the "truce" collapsed and was terminated. The *Ranfla Nacional* blamed the end of the "truce" on the United States, believing that the United States government pressured the government of El Salvador to end the "truce" as a condition of receiving funds from the United States.

24.    After the end of the "truce," the government of El Salvador moved several of the defendants back to more secure prisons with harsher conditions. In retaliation, and in an effort to force the government of El Salvador to enter into new negotiations, the *Ranfla Nacional* ordered MS-13 members in El Salvador to increase violence, resulting in a significant increase in violence and murders, especially of police officers and government officials. Because they believed that the United States government was to blame for the collapse of the "truce," the *Ranfla Nacional* directed MS-13 leaders in the United States to increase violence in the United States.

25.    In early 2016, the *Ranfla Nacional* began planning for a major campaign of coordinated violence in El Salvador in retaliation for the harsher measures imposed on its members after the end of the truce. All cliques in El Salvador were ordered to provide two members to create a specialized unit of MS-13 members to be used to attack the police. These members were to undergo military training at MS-13 military training camps in El Salvador. All cliques, including those in the Eastern District of New York and elsewhere in the United States, were ordered to provide all of their profits from select months for a special collection to be used

12

to purchase weapons for the planned attacks on police in El Salvador. These weapons included machine guns, grenades, IEDs and rocket launchers. Over $600,000 was collected for this fund, and MS-13 began purchasing weapons. Cliques in El Salvador were directed to identify the names and addresses of police officers, military members and government officials in their areas as potential targets for the planned attacks.

26. The *Ranfla Nacional* continued to negotiate with political parties in El Salvador and to use its control of the level of violence to influence the actions of the government in El Salvador.

<u>Special Designations</u>

27. On July 24, 2011, United States President Barack Obama issued Executive Order 13581, which declared a national emergency with respect to the activities of significant transnational criminal organizations. Executive Order 13581 was based on a presidential finding that "significant transnational criminal organizations constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Executive Order 13581 applied to specific significant transnational criminal organizations named in the annex to the order and to any person or entity designated by the Secretary of the Treasury as a significant transnational criminal organization. Among other things, Executive Order 13581 prohibited transactions by United States persons or involving United States property with designated significant transnational criminal organizations.

28. On October 11, 2012, the Secretary of the Treasury designated MS-13 as a significant transnational criminal organization, pursuant to Executive Order 13581.

13

29. In June 2013, the Department of the Treasury specially designated defendants HENRIQUEZ and TURCIOS, members of the *Ranfla Nacional*, as leaders of MS-13 subject to the sanctions imposed by Executive Order 13581.

30. In April 2015, the Department of the Treasury specially designated defendants CANALES-RIVERA, ERAZO-NOLASCO and MENDOZA-FIGUEROA, members of the *Ranfla Nacional*, as leaders of MS-13 subject to the sanctions imposed by Executive Order 13581.

31. On August 24, 2015, the Supreme Court of El Salvador designated MS-13 a terrorist organization under El Salvador's Special Laws Against Terrorism.

<u>The Defendants</u>

32. The defendant BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de Hollywood," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

33. The defendant ELMER CANALES-RIVERA, also known as "Crook de Hollywood," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

34. The defendant EFRAIN CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," was a member of MS-13 and was a member of the *Ranfla Nacional*.

35. The defendant RICARDO ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

14

36. The defendant EDUARDO ERAZO-NOLASCO, also known as "Colocho de Western" and "Mustage de Western," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

37. The defendant EDSON SACHARY EUFEMIA, also known as "Speedy de Park View," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

38. The defendant JOSE FERNANDEZ FLORES-CUBAS, also known as "Cola de Western," was a member of MS-13 and was a member of the *Ranfla Nacional*.

39. The defendant FREDY IVAN JANDRES-PARADA, also known as "Lucky de Park View" and "Lacky de Park View," was a member of MS-13 and was a member of the *Ranfla Nacional*.

40. The defendant LEONEL ALEXANDER LEONARDO, also known as "El Necio de San Cocos," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

41. The defendant CESAR HUMBERTO LOPEZ-LARIOS, also known as "El Grenas de Stoners" and "Oso de Stoners," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

42. The defendant JOSE LUIS MENDOZA-FIGUEROA, also known as "Pavas de 7-11" and "Viejo Pavas de 7-11," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

43. The defendant HUGO ARMANDO QUINTEROS-MINEROS, also known as "Flaco de Francis," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

15

44. The defendant SAUL ANTONIO TURCIOS, also known as "Trece de Teclas," was a member of MS-13, was an original member of the Twelve Apostles of the Devil and was a member of the *Ranfla Nacional*.

*45.* The defendant ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas," was a member of MS-13 and was a member of the *Ranfla Nacional*.

<u>Purpose of the *Ranfla Nacional*</u>

46. The overall purpose of the *Ranfla Nacional* was to direct the criminal activities of MS-13 in El Salvador, the United States, including in the Eastern District of New York, and elsewhere. Specific goals included the following:

    a. Preserving, expanding and protecting the power, territory and reputation of MS-13 in El Salvador, the United States, including the Eastern District of New York, and elsewhere through the use of violence, threats of violence and intimidation;

    b. Influencing the actions of governments in El Salvador and elsewhere to implement policies favorable to MS-13;

    c. Supporting specific political parties in Salvadoran elections with the purpose of obtaining benefits in return when members of such parties took office;

    d. Retaliating against the government of El Salvador and against the United States for actions believed to be unfavorable to MS-13;

    e. Establishing control of territory and civilian populations in El Salvador, the United States, including the Eastern District of New York, and elsewhere that MS-13 could use and exploit to its benefit;

    f. Promoting and enhancing MS-13 and the activities of its members and associates in El Salvador, the United States, including the Eastern District of New York, and

elsewhere by committing crimes, including, but not limited to, murder, attempted murder, assault, other crimes of violence, extortion and drug trafficking;

g.      Keeping victims, potential victims, community members and members of law enforcement in El Salvador, the United States, including the Eastern District of New York, and elsewhere in fear of MS-13 and its members through violence, threats of violence and intimidation;

h.      Confronting and retaliating against rival gangs in El Salvador, the United States, including the Eastern District of New York, and elsewhere through the use of violence, threats of violence and intimidation;

i.      Murdering, attempting to murder and assaulting individuals believed to be cooperating with law enforcement authorities in El Salvador, the United States, including the Eastern District of New York, and elsewhere;

j.      Hindering and obstructing efforts of law enforcement to identify, apprehend and successfully prosecute offending MS-13 members in El Salvador, the United States, including the Eastern District of New York, and elsewhere;

k.      Providing financial support to MS-13 members, including incarcerated MS-13 members in El Salvador, the United States, including the Eastern District of New York, and elsewhere; and

l.      Enriching themselves through receipt of the proceeds of MS-13's criminal activities, including extortion and drug trafficking, from members and cliques in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

17

<u>Manner and Means Used by the *Ranfla Nacional*</u>

47.     In order to carry out the aforementioned goals, the *Ranfla Nacional*,
together with other members of MS-13, within El Salvador, the United States, including in the
Eastern District of New York, and elsewhere, used a variety of manner and means, including the
following:

        a.     The *Ranfla Nacional* issued rules and directives that MS-13
members in El Salvador, the United States, including the Eastern District of New York, and
elsewhere were required to follow.  The rules included procedures for investigating violations of
the rules and punishments for violators that included beatings and death;

        b.     The *Ranfla Nacional* directed violence against members of the
government of El Salvador, including police officers, military members, and other government
officials, and their families, in retaliation for taking actions against MS-13;

        c.     The *Ranfla Nacional* directed an increase in violence in the United
States, including murders, in retaliation for what it believed was the role of the United States
government in the termination of a "truce" with the Salvadoran government;

        d.     The *Ranfla Nacional* ordered the murder of a Federal Bureau of
Investigation special agent assigned to official duties in El Salvador on account of the special
agent's performance of those duties;

        e.     The *Ranfla Nacional* required members of MS-13 to obtain
authorization from the *Ranfla Nacional* to commit murders in El Salvador, the United States,
including the Eastern District of New York, and elsewhere;

        f.     The *Ranfla Nacional* periodically provided general authorization,
called "opening the valves," to MS-13 members in El Salvador, the United States, including the

18

Eastern District of New York, and elsewhere to commit murders of rival gang members, members of law enforcement, individuals cooperating with law enforcement and others in disputes with MS-13;

       g.     The *Ranfla Nacional* authorized MS-13 members to commit specific murders in El Salvador, the United States, including the Eastern District of New York, and elsewhere. This authorization was called issuing a "green light;"

       h.     The *Ranfla Nacional* settled disputes between MS-13 cliques in El Salvador, the United States, including the Eastern District of New York, and elsewhere;

       i.     The *Ranfla Nacional* negotiated with the government of El Salvador to obtain benefits and concessions for itself and for MS-13 members;

       j.     The *Ranfla Nacional* used traditional and online media to manage its image, make demands of the government of El Salvador, issue threats and publicize acts of violence to intimidate the police and civilian population of areas under its control;

       k.     The *Ranfla Nacional* directed the collection of money from every clique, including cliques in the Eastern District of New York and elsewhere in the United States, to be used to fund the purchase of weapons, including machine guns, handguns, grenades, IEDs and body armor to be used to attack police, military and government officials in El Salvador, in retaliation for taking actions against MS-13;

       l.     The *Ranfla Nacional* established training camps in El Salvador for MS-13 members to be trained in military tactics and the use of military-grade weapons;

       m.     The *Ranfla Nacional* used cellular telephones, including contraband cellular telephones illegally smuggled into jails and prisons, and encrypted application-based communication systems to discuss gang-related business and to direct the

activities of MS-13 in El Salvador, the United States, including the Eastern District of New York, and elsewhere;

   n. The *Ranfla Nacional* issued written orders, called "*wilas*," that were smuggled out of prisons and distributed to MS-13 members;

   o. The *Ranfla Nacional* created a system to manage MS-13 from prison when the conditions of the prison made it impossible for the *Ranfla Nacional* to communicate directly with members outside of prison, including using co-conspirators to create lines of communication to communicate with members outside of prison on specific topics;

   p. The *Ranfla Nacional* required MS-13 members and cliques in the United States, including in the Eastern District of New York, to pay dues, often the proceeds of drug trafficking and extortions, to send to MS-13 leadership in El Salvador to provide financial support for MS-13, including for the purchase of weapons for use in committing acts of violence in El Salvador;

   q. The *Ranfla Nacional* engaged in, managed, organized and directed MS-13 members to engage in extortion of businesses, individuals and public transportation entities in El Salvador, the United States, including the Eastern District of New York, and elsewhere;

   r. The *Ranfla Nacional* engaged in, managed and directed MS-13 members to engage in drug trafficking to earn money to support the activities of MS-13 and enrich the members of the *Ranfla Nacional*;

   s. The *Ranfla Nacional* sought to obtain, and directed MS-13 members to obtain and stockpile, weapons;

t.     The *Ranfla Nacional* directed MS-13 members to obtain and use explosives, grenades, IEDs and rockets;

u.     The *Ranfla Nacional* directed MS-13 members to use non-gang members to send and receive funds such as dues payments from members and cliques in the United States, including in the Eastern District of New York, to MS-13 in El Salvador in order to conceal the source and recipients of the funds;

v.     The *Ranfla Nacional* created an organizational structure of lesser *ranflas*, zones, Programs and cliques to manage the activities of MS-13 in El Salvador, the United States, including the Eastern District of New York, and elsewhere. When necessary, the *Ranfla Nacional* made changes to the leadership and organizational structure;

w.     The *Ranfla Nacional* issued rules and created a rank structure for controlling the recruitment of new members and their advancement within MS-13;

x.     The *Ranfla Nacional* appointed and promoted members to serve as lower level leaders within MS-13;

y.     The *Ranfla Nacional* dispatched members and subordinate leaders to the United States to manage and improve MS-13 operations in the United States, often resulting in an increase in violence in the United States;

z.     The *Ranfla Nacional* dispatched members and subordinate leaders to Mexico to develop and manage MS-13 operations in Mexico related to drug trafficking, weapons trafficking, human trafficking and smuggling;

aa.     The *Ranfla Nacional* issued orders to kill individuals believed to be cooperating with law enforcement; and

21

34

bb.    The *Ranfla Nacional* directed members of MS-13 to use violence to intimidate the local civilian population in El Salvador, to influence the civilian population to vote for political parties associated with MS-13, to influence the actions of the government of El Salvador, to retaliate against government actions, to attempt to force the government to negotiate and to kill law enforcement officers in El Salvador.

<u>COUNT ONE</u>
(Conspiracy to Provide and Conceal Material Support and Resources to Terrorists)

48.    The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

49.    In or about and between 2002 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York, El Salvador, and elsewhere, the defendants BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de Hollywood," ELMER CANALES-RIVERA, also known as "Crook de Hollywood," EFRAIN CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," RICARDO ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," EDUARDO ERAZO-NOLASCO, also known as "Colocho de Western" and "Mustage de Western," EDSON SACHARY EUFEMIA, also known as "Speedy de Park View," JOSE FERNANDEZ FLORES-CUBAS, also known as "Cola de Western," FREDY IVAN JANDRES-PARADA, also known as "Lucky de Park View" and "Lacky de Park View," LEONEL ALEXANDER LEONARDO, also known as "El Necio de San Cocos," CESAR HUMBERTO LOPEZ-LARIOS, also known as "El Grenas de Stoners" and "Oso de Stoners," JOSE LUIS MENDOZA-FIGUEROA, also known as "Pavas de 7-11" and "Viejo Pavas de 7-11," HUGO ARMANDO QUINTEROS-MINEROS, also known as "Flaco de Francis," SAUL ANTONIO TURCIOS, also known as "Trece de Teclas," and ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas,"

22

together with others, did knowingly and intentionally combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of material support and resources, including, but not limited to, personnel, including themselves, currency and monetary instruments, training, weapons, explosives and services, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill or maim persons outside the United States); Title 18, United States Code, Sections 1114(1) (killing or attempting to kill an officer or employee of the United States); Title 18, United States Code, Section 2332(b) (conspiracy to kill United States nationals); Title 18, United States Code, Section 2332b (acts of terrorism transcending national boundaries); and Title 21, United States Code, Section 960a (narco-terrorism), and the death of one or more persons resulted.

(Title 18, United States Code, Sections 2339A(a) and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Commit Acts of Terrorism Transcending National Boundaries)

50.     The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

51.     In or about and between 2002 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York, El Salvador, and elsewhere, and involving conduct transcending national boundaries, the defendants BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de Hollywood," ELMER CANALES-RIVERA, also known as "Crook de Hollywood," EFRAIN CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," RICARDO ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," EDUARDO ERAZO-NOLASCO,

23

also known as "Colocho de Western" and "Mustage de Western," EDSON SACHARY EUFEMIA, also known as "Speedy de Park View," JOSE FERNANDEZ FLORES-CUBAS, also known as "Cola de Western," FREDY IVAN JANDRES-PARADA, also known as "Lucky de Park View" and "Lacky de Park View," LEONEL ALEXANDER LEONARDO, also known as "El Necio de San Cocos," CESAR HUMBERTO LOPEZ-LARIOS, also known as "El Grenas de Stoners" and "Oso de Stoners," JOSE LUIS MENDOZA-FIGUEROA, also known as "Pavas de 7-11" and "Viejo Pavas de 7-11," HUGO ARMANDO QUINTEROS-MINEROS, also known as "Flaco de Francis," SAUL ANTONIO TURCIOS, also known as "Trece de Teclas," and ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas," together with others, did knowingly and intentionally combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to kill, kidnap, maim, commit assaults resulting in serious bodily injury and assault with a dangerous weapon any person within the United States in violation of the laws of any State, and the death of one or more persons resulted.

52. In engaging in the unlawful conspiracy set forth in this Count, at least one of the following circumstances is applicable to at least one offender: (1) a facility of interstate and foreign commerce, including, but not limited to, a cellular telephone, tablet computer and Internet-based social media accounts, was used in furtherance of the offense; and (2) the offense obstructed, delayed and affected interstate and foreign commerce, and would have affected interstate and foreign commerce if the offense had been consummated.

(Title 18, United States Code, Sections 2332b(a)(1)(A), 2332b(a)(2), 2332b(b)(1)(A), 2332b(b)(1)(B), 2332b(c) and 3551 et seq.)

24

COUNT THREE
(Conspiracy to Finance Terrorism)

53.     The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

54.     In or about and between 2002 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York, El Salvador, and elsewhere, the defendants BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de Hollywood," ELMER CANALES-RIVERA, also known as "Crook de Hollywood," EFRAIN CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," RICARDO ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," EDUARDO ERAZO-NOLASCO, also known as "Colocho de Western" and "Mustage de Western," EDSON SACHARY EUFEMIA, also known as "Speedy de Park View," JOSE FERNANDEZ FLORES-CUBAS, also known as "Cola de Western," FREDY IVAN JANDRES-PARADA, also known as "Lucky de Park View" and "Lacky de Park View," LEONEL ALEXANDER LEONARDO, also known as "El Necio de San Cocos," CESAR HUMBERTO LOPEZ-LARIOS, also known as "El Grenas de Stoners" and "Oso de Stoners," JOSE LUIS MENDOZA-FIGUEROA, also known as "Pavas de 7-11" and "Viejo Pavas de 7-11," HUGO ARMANDO QUINTEROS-MINEROS, also known as "Flaco de Francis," SAUL ANTONIO TURCIOS, also known as "Trece de Teclas," and ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas," together with others, did knowingly and intentionally combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to unlawfully and willfully provide and collect funds, by any means, directly and indirectly, with the intention that such funds be used, and with the knowledge that such funds were to be used, in full or in part, in order to carry out any act intended to cause death and serious bodily injury to a civilian, and to any

25

other person not taking an active part in hostilities in a situation of armed conflict, when the

purpose of such act, by its nature and context, was to intimidate a population, and to compel a

government or an international organization to do and to abstain from doing any act.

(Title 18, United States Code, Sections 2339C(a)(1)(B), 2339C(a)(2) and 3551 et

seq.)

COUNT FOUR
(Narco-Terrorism Conspiracy)

55.     The allegations contained in paragraphs one through 47 are realleged

and incorporated as if fully set forth in this paragraph.

56.     In or about and between 2002 and the date of this Indictment, both dates

being approximate and inclusive, within the Eastern District of New York, El Salvador, and

elsewhere, the defendants BORROMEO ENRIQUE HENRIQUEZ, also known as "Diablito de

Hollywood," ELMER CANALES-RIVERA, also known as "Crook de Hollywood," EFRAIN

CORTEZ, also known as "Tigre de Park View" and "Viejo Tigre de Park View," RICARDO

ALBERTO DIAZ, also known as "Rata de Leewards" and "Mousey de Leewards," EDUARDO

ERAZO-NOLASCO, also known as "Colocho de Western" and "Mustage de Western," EDSON

SACHARY EUFEMIA, also known as "Speedy de Park View," JOSE FERNANDEZ FLORES-

CUBAS, also known as "Cola de Western," FREDY IVAN JANDRES-PARADA, also known

as "Lucky de Park View" and "Lacky de Park View," LEONEL ALEXANDER LEONARDO,

also known as "El Necio de San Cocos," CESAR HUMBERTO LOPEZ-LARIOS, also known

as "El Grenas de Stoners" and "Oso de Stoners," JOSE LUIS MENDOZA-FIGUEROA, also

known as "Pavas de 7-11" and "Viejo Pavas de 7-11," HUGO ARMANDO QUINTEROS-

MINEROS, also known as "Flaco de Francis," SAUL ANTONIO TURCIOS, also known as

"Trece de Teclas," and ARISTIDES DIONISIO UMANZOR, also known as "Sirra de Teclas,"

26

together with others, did knowingly and intentionally combine, conspire, confederate and agree

with each other and others known and unknown to the Grand Jury, to engage in conduct that

would be punishable under Title 21, United States Code, Section 841(a), if committed within the

jurisdiction of the United States, that is to knowingly and intentionally distribute and possess

with intent to distribute marijuana, cocaine, heroin, methamphetamine and other controlled

substances, knowing and intending to provide, directly and indirectly, anything of pecuniary

value to any person and organization, to wit: MS-13, that has engaged and engages in terrorist

activity as defined in Title 8, United States Code, Section 1182(a)(3)(B), and terrorism as

defined in Title 22, United States Code, Section 2656f(d)(2).

     (Title 21, United States Code, Section 960a(a); Title 18, United States Code,

Sections 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE THROUGH THREE

     57.    The United States hereby gives notice to the defendants charged in Counts

One through Three that, upon their conviction of any such offenses, the government will seek

forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title

28, United States Code, Section 2461(c), which require any person convicted of such offenses to

forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or

indirectly as a result of such offenses; and (b) Title 18, United States Code, Section 981(a)(1)(G)

and Title 28, United States Code, Section 2461(c), which require the forfeiture of all assets,

foreign or domestic, (i) of any individual, entity or organization engaged in planning or

perpetrating any Federal crime of terrorism (as defined in Title 18, United States Code, Section

2332b(g)(5)) against the United States, citizens or residents of the United States or their property,

and all assets, foreign or domestic, affording any person a source of influence over any such

27

entity or organization; (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting or concealing any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States or their property; (iii) derived from, involved in or used or intended to be used to commit any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States or their property; or (iv) of any individual, entity or organization engaged in planning or perpetrating any act of international terrorism (as defined in Title 18, United States Code, Section 2331) against any international organization (as defined in Title 22, United States Code, Section 4309(b)) or against any foreign government.

58.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

28

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT FOUR

59.     The United States hereby gives notice to the defendants charged in Count Four that, upon their conviction of such offense, the government will seek forfeiture in accordance with: (a) Title 21, United States Code, Sections 853(a) and 970, which require any person convicted of such offense to forfeit (i) any property constituting, or derived from, any proceeds obtained directly or indirectly as the result of such offense; and (ii) any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense; and (b) Title 18, United States Code, Section 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), which require the forfeiture of all assets, foreign or domestic, (i) of any individual, entity or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization; (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting or concealing any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States or their property; (iii) derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)) against the United States, citizens or residents of the United States or their property; or (iv) of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in Title 18, United States Code, Section 2331) against any international organization (as defined in Title 22, United States Code, Section 4309(b)) or against any foreign Government.

60.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(G); Title 21, United States Code, Sections 853(a), 853(p) and 970; Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DUCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

30

F.#: 2020R00632
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

### BORROMEO ENRIQUE HENRIQUEZ, ET AL.,

### Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 981(a)(1)(C), 981(a)(1)(G), 2332b(a)(1)(A),
2332b(a)(2), 2332b(b)(1)(A), 2332b(b)(1)(B), 2332b(c), 2339A(a),
2339C(a)(1)(B), 2339C(a)(2), and 3551 et seq.; T. 21, U.S.C., §§ 853(a),
853(p), 960a(a), and 970); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____ _Elissa Dyer_ _____     *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____     *Clerk*

*Bail, $* _____

_____

**John J. Durham, Assistant U.S. Attorney (631) 715-7851**

44